UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:11-cr-00205-JAW-2 |
| | ) | |
| ALFARABICK MALLY | ) | |
|    a/k/a JACOB GARCIA | | |

**ORDER ON THE DEFENDANT'S REQUEST FOR A MINOR PARTICIPANT MITIGATING ROLE REDUCTION**

Having reviewed the details of Alfarabick Mally's involvement in a crack cocaine trafficking conspiracy that originated in New York City and did business in Bangor, Maine, the Court concludes that the Defendant has failed to demonstrate that he is entitled to a mitigating role reduction for being a minor participant pursuant to § 3B1.2(b) of the United States Sentencing Guidelines.

## I.     BACKGROUND

### A.     Statement of Facts

#### 1.     Mr. Mally's Role in the Conspiracy

By agreement of the parties, the Court reviewed three sources of information to determine and assess Alfarabick Mally's role in the crack cocaine conspiracy: (1) the Prosecution Version, the truth of which he confirmed during his guilty plea; (2) the Presentence Report, the truth of which the parties have relied upon in their memoranda; and (3) Mr. Mally's testimony during the trial of co-conspirators Ed Cogswell and Manuel Trinadad-Acosta.

Alfarabick Mally, also known as Jacob Garcia, was born on December 25, 1989 in New York City. *Revised Presentence Investigation Report for Jacob Garcia* ¶ 29 (*PSR*). Mr. Mally became involved in the drug trafficking business in Bangor, Maine through his relationship with Dawlin Cabrera. *Partial Tr. of Proceedings: Tr. of Jacob Garcia's Test.* at 103:25-104:22. (ECF No. 412) (*Mally Tr.*). The conspiracy involved a group of men from or with ties to the Dominican Republic led by Mr. Cabrera, the "Boss Man." *PSR* ¶ 5. Mr. Mally had known Mr. Cabrera since he was about ten and called him "uncle" as a token of respect for an older family acquaintance. *Id.* at 100:14-101:17. Mr. Mally says he became involved in the Bangor, Maine crack cocaine distribution conspiracy in October 2010 to support his girlfriend and daughter. *PSR* ¶¶ 6, 12.

During the life of the fourteen month conspiracy, Mr. Mally and his co-conspirators distributed at least 350 grams of crack cocaine per month in the Bangor area. *Prosecution Version for Jacob Garcia* (ECF No. 272) (*Pros. Version*); *PSR* ¶ 9. When Mr. Mally first joined the conspiracy, the conspiracy's operations were run out of a house on Kenduskeag Avenue in Bangor. *PSR* ¶ 6. In January 2011, the conspiracy moved operations to 100 B Ohio Street. *Id.*

Along with other drug couriers, Mr. Mally was responsible for transporting crack cocaine from New York City to Bangor by commercial bus. *Pros. Version* at 1. At a trial of two of his co-conspirators, Mr. Mally testified that he made twelve to thirteen trips from New York to Bangor, seven or eight to deliver crack cocaine. *Mally Tr.* at 172:7-15. He testified that he was paid $500 per trip. *Id.* at 111:5-10.

Beyond transporting the drugs to Bangor, Mr. Mally answered the "order" phone, assisted in arranging crack cocaine sales, helped deposit funds generated by the conspiracy, and translated for his Spanish-speaking co-conspirators. *Pros. Version* at 1-2; *PSR* ¶¶ 7, 8; *Def.'s Mem. Regarding Sentencing* at 3 (ECF No. 434) (*Def.'s Mem.*).

On November 30, 2010, at Mr. Cabrera's direction, Mr. Mally helped Manuel Trinidad-Acosta, one of his co-conspirators, make a cash deposit of the proceeds of the conspiracy into an account at Bank of America held in the name of a Cabrera associate from the Dominican Republic, Dary Fermin. *PSR* ¶ 8; *Mally Tr.* at 113:15-115:14. On July 16, 2011, he assisted with the deposit of $8,000 into a Bank of America account in the name of Rolando Rosario-Andujar, an alias for Dawlin Cabrera. *Id.* at 115:23-116:2.

On June 15, 2011, law enforcement officers attempted to make a controlled buy of cocaine using a confidential informant who spoke over the telephone to Mr. Mally. *PSR* ¶ 7. Mr. Mally reported that he was acting as a translator for someone in the background of the call but refused to make the sale because the confidential informant was calling from a blocked number. *Id.* During his involvement in the conspiracy, Mr. Mally "babysat" dealers at distribution locations to make sure they did not steal the drugs and he possessed firearms at various points during the conspiracy.[1] *PSR* ¶ 15; *Def.'s Mem.* at 3.

---

[1] Mr. Mally disputes whether he directly handled the Smith and Wesson firearm discovered by law enforcement officers at 102 B Ohio Street on November 3, 2011. *Def.'s Mem.* at 3-4; *see PSR* ¶ 6. Abraham Lluberes, a co-conspirator, testified that Mr. Mally grabbed the gun from the third floor of 100 B Ohio Street and took it to the apartment next door. *Def.'s Mem.* at 3-4; *Partial Tr. of*

Mr. Mally's familiarity with the Cabrera conspiracy included specific knowledge about the nature of the drug sold—crack cocaine, *Mally Tr.* at 105:5-106:15, the way the crack was packaged—in bags, *id.* at 106:16-17, the drug quantity in each baggie—.25 to .28 grams, *id.* at 109:19-20, and the price per baggie—$40, *id.* at 109:14-18. He was also aware that the drug conspiracy operated under a trade name called the Beer Factory Corporation and that callers would refer to crack cocaine and powder cocaine by using the code words, "Heineken" and "Coors Light" respectively. *Id.* at 117:21-118:12. As the translator for the drug dealers, Mr. Mally came to know the individuals who were selling drugs for the Cabrera conspiracy, two of whom were his half-brothers, and he recognized a list of the conspiracy's customers. *Id.* at 102:6-103:6, 112:20-113:2, 133:17-25. Mr. Mally was also aware of the ledger sheets that were maintained for the Cabrera conspiracy and that Abraham Lluberas and Jowenky Nunez were the persons within the organization in Bangor who were in charge of keeping track of the finances. *Id.* at 128:19-129:15. Mr. Mally described his role in the conspiracy as being a mule, transporting the drugs from New York City to Bangor, and being a secretary when he was in Bangor, answering the phone and translating, but never selling drugs. *Id.* at 150:19-24.

---

*Proceedings: Tr. of Abraham Lluberes Test.* at 105:7-17 (ECF No. 411). Mr. Mally suggests that because Mr. Lluberes grabbed the drugs, "[i]t would be natural if he also grabbed the gun." *Def.'s Mem.* at 4. Whether Mr. Mally directly handled the gun on November 3, 2011 does not affect his eligibility for a U.S.S.G. § 3B1.2(b) point reduction, and the Court does not resolve this factual dispute or reference it in the Statement of Facts.

4

### 2. Mr. Mally's Co-conspirators' Actions

According to the Superseding Indictment, Mr. Mally's co-conspirators included Dawlin Cabrera, Jowenky Nunez, Abraham Lluberes, Pauline Rossignol, Manuel Trinidad-Acosta, and Ed Cogswell.[2] *Superseding Indictment* at 1 (ECF No. 81). Mr. Cabrera, Mr. Nunez, Mr. Lluberes, and Ms. Rossignol pleaded guilty to the charges contained in the Superseding Indictment. *See Minute Entry* (ECF No. 325); *Minute Entry* (ECF No. 366); *Minute Entry* (ECF No. 284); *Minute Entry* (ECF No. 375). The Government's Prosecution Versions outline each co-conspirator's role in the conspiracy.

Mr. Cabrera obtained crack cocaine for the conspiracy in New York and arranged for couriers to transport it to Bangor, Maine. *Prosecution Version for Dawlin Cabrera* at 2 (ECF No. 321). He paid the New York drug supplier and monitored the drug distribution operation in Bangor, making frequent visits to Bangor to ensure that drug proceeds were properly accounted for. *Id.* Mr. Cabrera set up logistics for the operation, such as establishing a bank account in his name to receive drug proceeds, renting the 100 B Ohio Street apartment, renting and paying for furniture for the Ohio Street apartment, and initially obtaining and paying for the drug "order" phone listed in Mr. Mally's name. *Id.*

Mr. Nunez distributed crack cocaine in Bangor, supervised his co-conspirators' conspiracy-related activities, sometimes delivered crack cocaine to other distributors, arranged drug sales, and deposited drug proceeds into

---

[2]   The Court has not included Luis Gonzalez or Kelvin Mally in this list because the United States dismissed the charges against Mr. Gonzalez and Mr. Mally has not been arrested. *See Order of Discharge* (ECF No. 289); *Docket for Kelvin Mally,* 1:11-cr-205-JAW-9.

designated bank accounts. *Prosecution Version for Jowenky Nunez* at 2 (ECF No. 353). Mr. Lluberes distributed bundles of crack cocaine to dealers who would make sales to customers and he maintained an accounting of the drugs distributed, the proceeds collected, and the expenses incurred. *Prosecution Version for Abraham Lluberes* at 2 (ECF No. 278). Ms. Rossignol purchased cocaine from the conspiracy at least 250 times, introduced customers to her co-conspirators, and sometimes permitted her co-conspirators to take phone orders for crack cocaine at her home. *Prosecution Version for Pauline Rossignol* at 1-2 (ECF No. 370). On January 31, 2013, Mr. Trinidad-Acosta and Mr. Cogswell were convicted of conspiracy to distribute and to possess with intent to distribute cocaine and cocaine base after a jury trial on the charges contained in the Superseding Indictment. *Jury Verdict* (ECF No. 390). Mr. Mally testified that Mr. Cogswell sold crack cocaine for the conspiracy and that Mr. Trinidad-Acosta was a "worker", meaning he sold drugs, deposited drug sale proceeds in the conspiracy's bank accounts, and sometimes kept track of how much crack cocaine was sold. *Mally Tr.* at 112:20-113:14, 119:13-120:18, 129:11-14.

### 3. The End of the Conspiracy

The Government filed a criminal complaint on November 1, 2011 charging Mr. Mally and several of his co-conspirators with conspiracy to possess with intent to distribute 28 grams or more of cocaine base. *PSR* ¶ 1. On November 2, 2011 and November 3, 2011, law enforcement officials executed search warrants at an apartment on Ohio Street and an apartment on Garland Street. *Pros. Version* at 2;

*PSR* ¶ 6.  Officials discovered crack cocaine with a net weight of approximately 368 grams at the Garland Street apartment and drug ledgers, expense ledgers, mail in Mr. Mally's name, as well as a Smith and Wesson firearm at the Ohio Street apartment.  *Pros. Version* at 2; *PSR* ¶ 6.  Mr. Mally was arrested on November 2, 2011 on the criminal complaint.  *PSR* ¶¶ 1, 6.

### B. Procedural History

In the Presentence Report, the Probation Office (PO) declined to apply U.S.S.G. § 3B1.2(b) and decrease Mr. Mally's offense level by two points concluding that "the defendant, given his numerous roles, had knowledge into the scope and operations of the conspiracy" and was as culpable as the "average participant."  *PSR* ¶¶ 14, 17, 19, 23, *PSR Addendum* ¶¶ 14, 17, 19, 23.  At a pre-sentence conference on March 25, 2013, Mr. Mally argued against the PO's decision and urged the Court to apply the minor participant role adjustment.  *Minute Entry* (ECF No. 417).  The Court ordered the parties to file briefs in support of their positions.  Mr. Mally filed his sentencing memorandum on April 16, 2013, *Def.'s Mem.,* and the Government responded on April 29, 2013, *Sentencing Mem. of the United States* (ECF No. 444) (*Gov't's Mem.*).

## II. THE PARTIES' POSITIONS

### A. Mr. Mally's Sentencing Memorandum

Asserting that his role in the conspiracy was minor when compared to Dawlin Cabrera, "the 'boss of bosses'", and his other co-conspirators, often referred to as "'lieutenants'", Mr. Mally argues that he is entitled to a U.S.S.G. § 3B1.2(b)

7

adjustment. *Def.'s Mem.* at 1, 7.  Although he admits that he acted as a courier for the drugs on several occasions, translated for members of the conspiracy, answered the "order phone", and "babysat" dealers to ensure the drugs were secure, Mr. Mally contends that he "had no discretion and was paid a relatively small amount of money to do discrete tasks." *Id.* at 3, 4-5, 7 (noting that he did not distribute drugs or keep track of drug sale proceeds and was only paid $500 per trip).  In fact, he labels many of the acts he performed for the conspiracy as "favors" and notes that he was not the only drug courier. *Id.* at 3.  Mr. Mally also points out that there is "a divergence of opinion" regarding whether he hid a Smith and Wesson firearm in the area where he was ultimately arrested; nevertheless, he concedes that he possessed pistols at various points during the conspiracy. *Id.*

Mr. Mally states that to receive a U.S.S.G. § 3B1.2(b) adjustment he must satisfy the "malleable concept" of being "'substantially less culpable' than the average participant" in the conspiracy. *Id.* at 5. (quoting U.S.S.G. § 3B1.2, cmt. 3(A)).  Citing *United States v. Diaz-Rios*, he notes that some courts take the totality of the circumstances approach in determining a minor role reduction question, which includes an assessment of the defendant's "'role in the conspiracy as a whole, including the length of his involvement in it, his relationship with other participants, his potential financial gain, and his knowledge of the conspiracy.'" *Id.* at 6 (quoting 706 F.3d 795, 798-99 (7th Cir. 2013)).  Pointing to another Seventh Circuit case, Mr. Mally argues that the fact that "he acted repeatedly, rather than only on a single occasion, does not foreclose the receipt of a role reduction." *Id.* at 7

8

(citing *United States v. Leiskunas*, 656 F.3d 732, 739 (7th Cir. 2011)).  Also, Mr. Mally insists that "[m]any of the appellate decisions upholding the denial of a role adjustment may be misleading with respect to the current application of the minor role guideline" given that the Sentencing Commission struck two portions of § 3B1.2's notes to avoid discouraging courts from applying the adjustment.  *Def.'s Mem.* at 8.  Finally, he asserts that "[a]ll of the facts available to the Court indicate that for the 'average' participant who is being held responsible at a level 38, he is clearly [ ] less culpable."  *Id.* at 9.

### B.  The Government's Response

In response, the Government includes a detailed statement of facts concerning Mr. Mally's involvement in the conspiracy.  *Gov't's Mem.* at 1-5.  Not only was Mr. Mally a courier "of most of the crack cocaine brought to Bangor from New York City", but the Government contends he served as a "baby-sitter", handled money from drug transactions, answered the order phone, occasionally paid routine bills for the conspiracy, deposited proceeds from the conspiracy into bank accounts, and made drug deliveries and sales.  *Id.* at 7.  Although Mr. Mally may not have commanded the same "authority to manage" as some co-conspirators, the Government argues that his role in the conspiracy prevents him from proving that he was "both less culpable than his confederates and the mine-run of other wrongdoers who have committed similar crimes."  *Id.*  Thus, the Government asserts the Court should not grant Mr. Mally's request for a § 3B1.2(b) minor role reduction.  *Id.*

### III.  DISCUSSION

####   A.   Legal Standard for Application of U.S.S.G. § 3B1.2(b)

Section 3B1.2(b) of the United States Sentencing Guidelines authorizes the Court to decrease Mr. Mally's offense level by two levels if the Court finds that he was a minor participant in the conspiracy. U.S.S.G. § 3B1.2(b). To be eligible for a minor participant adjustment, the defendant's role in the conspiracy must "make him substantially less culpable than the average participant." *Id*. § 3B1.2, cmt. 3(A). A minor participant is a defendant "who is less culpable than most other participants, but whose role could not be described as minimal" under § 3B.1.2(a). *Id*. at cmt. 5. A participant plays a minimal role in an offense under § 3B1.2(a) when he is "plainly among the least culpable of those involved in the conduct of a group." *Id*. at cmt. 4. When assessing the applicability of a § 3B1.2(b) adjustment, the Guidelines instruct the Court to base its decision on the totality of the circumstances and the facts of the particular case. *Id*. at cmt. 3(C).

In *United States v. Vargas*, the First Circuit held that "[a] defendant who seeks a minor role adjustment bears the burden of proving his entitlement thereto . . . [and] must show, by a preponderance of the evidence, that he was less culpable than both [1] his confederates and [2] the mine-run of other wrongdoers who have committed similar crimes." 560 F.3d 45, 50-51 (1st Cir. 2009). The defendant in *Vargas* was a one-time drug courier. *Id*. at 50. Because he participated in only one phase of the conspiracy and simply transported the drugs, the defendant argued that the district court improperly denied him a § 3B1.2(b) offense level reduction.

*Id.* at 51. The Court rejected his argument and concluded that the facts supported the district court's decision because "[s]ome couriers are more central to the plot than others" and "[a] defendant who participates in only one phase of a conspiracy may nonetheless be found to play a non-minor role in the conspiracy as a whole." *Id.*

The First Circuit reached a similar conclusion in *United States v. Quinones-Medina*, where the defendant also argued he was eligible for a minor role adjustment because he was "a simple courier who was participating in his first drug transaction." 553 F.3d 19, 22 (1st Cir. 2009). The *Quinones-Medina* Court disagreed with the defendant's version of the facts because beyond being caught by the police while transporting the first delivery of drugs, the record also showed that the defendant met with an undercover agent, was introduced as an associate of a major player in the conspiracy, and played an active role in cocaine-sale negotiations. *Id.* at 23 (finding that the facts supported "an inference of full-fledged participation"). The Court stated that even if the defendant was a simple courier, "[s]ome couriers may be fringe participants in a drug-trafficking scheme, but others may be more central to the plot." *Id.* Accordingly, the Court upheld the district court's decision to withhold application of § 3B1.2(b). *Id.*

Moreover, a lower-level co-conspirator's comparison of his actions with the actions of the conspiracy's leader is generally unpersuasive. *United States v. Garcia-Ortiz*, 657 F.3d 25, 29-30 (1st Cir. 2011). In *Garcia-Ortiz*, the First Circuit held that this kind of comparison is not helpful because it does not actually

establish that the defendant's conduct was minor. *Id.* at 30; *see United States v. Dung Cao*, 471 F.3d 1, 5 (1st Cir. 2006). Because, by his actions, the defendant in *Garcia-Ortiz* consented to sharing the risks, rewards, and responsibilities of the robbery, the Court affirmed the district court's conclusion that he did not merit a minor participant role adjustment. *Garcia-Ortiz*, 657 F.3d at 30. Furthermore, in *United States v. Olivero*, the First Circuit rejected the defendant's claim that he was a mere "'gofer'" as he was paid very little for completing low-level tasks in the conspiracy. 552 F.3d 34, 40 (1st Cir. 2009). Contrary to the defendant's position, the *Olivero* Court found that he played an active role in the conspiracy given that he negotiated with the conspiracy's customers and addressed logistical issues. *Id.* at 41.

Both Seventh Circuit Court of Appeals cases Mr. Mally cites, *Dias-Rios* and *Leiskunas*, are consistent with the mitigating role caselaw in the First Circuit. In *Diaz-Rios*, the Court applied a totality of the circumstances approach to assess whether the defendant's conduct was less culpable than the average wrongdoer in the conspiracy and ultimately vacated the defendant's sentence because the district court judge's ruling was ambiguous. 706 F.3d at 798-99. The Seventh Circuit thus applied the same totality of the circumstances approach applied in the First Circuit. *See Quinones-Medina*, 553 F.3d at 22 ("Determining the nature of a defendant's role is a fact-specific enterprise"); *United States v. Perez,* 210 F. App'x 20, 22 (1st Cir. 2006) (concluding that based on the "totality of the circumstances evidenced in the record" the district court properly rejected the defendant's § 3B1.2 minor role

12

request). The *Leiskunas* Court held that even where a defendant repeats acts vital to the success of the conspiracy, he may still be eligible for a § 3B1.2 reduction. 656 F.3d 732, 739 (7th Cir. 2011)). First Circuit caselaw supports this proposition as it considers the totality of the circumstances when deciding how to characterize the defendant's role in the crime. *See Quinones-Medina*, 553 F.3d at 22.

The only First Circuit case Mr. Mally cites involving a vacated mitigating role determination is *United States v. Miranda-Santiago*, 96 F.3d 517 (1st Cir. 1996). In *Miranda-Santiago*, the Court vacated the defendant's sentence and the district court's denial of a § 3B1.2(b) adjustment because the district court "simply adopted the PSR, in toto", which labeled the defendant as a minor participant, and did not make clear findings of fact regarding the defendant's § 3B1.2(b) argument. *Id.* at 531-32.

### B.     The Minor Role Adjustment

Given the totality of the circumstances of Mr. Mally's involvement in the conspiracy, the Court declines to reduce his offense level under § 3B1.2(b). Mr. Mally does not fit in the common concept of a "mule", a "simple courier" who merely transports drugs and is unaware of the broader conspiracy. *See Quinones-Medina*, 553 F.3d at 22. Mr. Mally knew the players in the Cabrera organization, beginning at the top with his "Uncle" Dawlin Cabrera and continuing to the other members, including two of his half-brothers. He was aware of the conspiracy's customers, the details of the drug transactions, including drug quantity and price. He was aware that after the drugs were sold, the proceeds were transferred from Bangor to New

York through bank accounts and he assisted the making of deposits in those accounts. Significantly, Mr. Mally's involvement reflects the trust his "uncle", the "Boss Man" of the conspiracy reposed in him, authorizing him to "babysit" the others.

Mr. Mally characterizes himself as a "raw recruit" and attempts to distance himself from his co-conspirators by arguing that they made more money and that they had more decision-making authority. *Def.'s Mem.* at 7-9. Yet Mr. Mally admits that he willingly transported drugs from New York City to Bangor, Maine on various occasions. *Id.* at 2. "He also performed other tasks" for the conspiracy such as answering the "order phone", assisting in arranging drug sales and depositing drug funds, "babysitting" dealers to ensure they would not steal drugs, and translating for Spanish-speaking co-conspirators at various points throughout the conspiracy. *Id.* at 3; *see Pros. Version* at 1-2; *PSR* ¶¶ 7, 8. Thus, the Court finds that Mr. Mally was more than a "simple courier." *See Quinones-Medina,* 553 F.3d at 22.

When assuming his additional roles in the conspiracy, which he describes as "favors", Mr. Mally facilitated the conspiracy and ensured its existence. *See id.* Also, his various roles in the conspiracy belie his claim that "[u]nlike others, [Mr. Mally] did not know how much he was carrying, how much the conspiracy moved altogether, or other details of the conspiracy." *Id.* at 5. Answering the ordering phone, translating for his fellow co-conspirators, and assisting in the making of bank deposits of drug proceeds, Mr. Mally learned details of the conspiracy and

14

commanded some level of authority. Although Mr. Mally emphasized that he never was actually directly involved in the buying and selling of drugs, as the translator for drug transactions, he participated in the drug sales and was integral to them. Mr. Mally even admits to possessing pistols at various points during the conspiracy while in the presence of his co-conspirators. *See id.* at 3.

Assessing the totality of the circumstances, the Court concludes that Mr. Mally is as culpable for the crack cocaine conspiracy as his fellow co-conspirators. *See* U.S.S.G. § 3B1.2, cmt. 3(A); *Vargas*, 560 F.3d at 50-51. The Court is not persuaded by the fact that Mr. Mally was less involved in the conspiracy than its ringleader, Dawlin Cabrera. *See Garcia-Ortiz*, 657 F.3d at 29-30; *Dung Cao*, 471 F.3d at 5. Although Mr. Mally's method of payment is a factor in determining his level of involvement, the Court is also not convinced that Mr. Mally's lower pay compared to some of his co-conspirators is sufficient to change the significance of his role. *See Olivero*, 552 F.3d at 40. Ultimately, when Mr. Mally's contributions to the conspiracy are compared with his co-conspirators' contributions, Mr. Mally is as culpable as the average participant because his actions—the transportation of the crack cocaine, translation services, "order" phone duties, arrangement of drug sales, "babysitting", and assistance with depositing drug sale proceeds into bank accounts—were critical to the success of the conspiracy and on par with the actions of his average co-conspirator.

Mr. Mally is also as culpable as the average drug conspiracy defendant. *See Vargas*, 560 F.3d at 50-51. The facts here are similar to *Olivero* where the First

15

Circuit rejected the defendant's self-portrayal as a low-paid "gofer" because Mr. Mally assumed other roles in the conspiracy, requiring him to interact with the conspiracy's customers and make logistical arrangements. *See* 552 F.3d at 40. Indeed, Mr. Mally played a more significant role in this conspiracy than the defendants in *Vargas* and *Quinones-Medina* where "simple couriers" were denied § 3B1.2(b) adjustments because their involvement in the conspiracies was more extensive. *Vargas,* 560 F.3d at 47, 50-52; *Quinones-Medina*, 553 F.3d at 22. In sum, the Court concludes that the facts do not support a § 3B1.2(b) downward adjustment because Mr. Mally was not a minor participant in the crack cocaine conspiracy. *See* § 3B1.2, cmt. 5.

### IV.   CONCLUSION

The Court DENIES Alfarabick Mally's request for a minor participant mitigating role reduction pursuant to U.S.S.G. § 3B1.2(b) (ECF No. 434).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 8th day of May, 2013